May it please the Court, I'm Karen Landau and I represent the appellant Richard Harkless. The primary question before the Court today is whether the defendant's waiver of his Sixth Amendment right to counsel was valid. And it was not. It was not because the Court misstated the applicable penalties, the applicable statutory penalties, but more important, because the advisements made by the Court would have led a reasonable defendant to think that he faced not an effective sentence of life, but a sentence of somewhere far less, perhaps under 10 years. Is that because he mentioned the co-defendants getting 51 and 70 months? Yes. And it's not only that the judge mentioned that the Court went to great lengths to bring this information out. The information also came personally from the Court instead of from the prosecutor. Now why was that relevant? I can't figure out why the Court decided to do that other than to try to convince the defendant to waive. I mean, what was the relevance of all of that? What happened to the other people? Your Honor, I don't know why, but certainly I think, you know, obviously I was not there on the Court. I can't read the judge's mind. I think, you know, for whatever reason, the judge decided to give the defendant more information rather than less. Unfortunately, in the context at hand, it was misleading. A little more and then mistaken. A little more, well, yes, the statutory part was mistaken. He told them the most he could get is 90 and he gave him 100, right? Well, he got 100 and more to the point. The judge told him the most he could get was 90 years? Well, yes, that's what she said. He said that. He recommended 130 or something. Yes, the probation officer had recommended 130. But you could get 300. At the time of the, yes, I think if I could just take it one step at a time. At the time he came in, at the time, because the charges changed, the government dismissed some charges before trial. But at the time that the defendant waived his right to counsel, he was actually facing 340 years. At the time of trial, I believe he was facing 140. Let me ask you about something that's not your main issue, but it bothers me. On the sentencing, since the sentencing is reasonable according to the guidelines and the judge gave reasons that would address the 3553 issues, it's a little hard for me to see why, if we got past the waiver, the sentence would be reversible. On the other hand, when I sentenced before the guidelines, the way I remember it, people who committed fraud, big fraud, usually got between five and ten years. Someone who passed a bad check at Walmart wouldn't get that, but big-time fraud, five or ten years. And I was always a little wary as a district judge of giving huge sentences where nobody got killed, because we are dealing with criminals, after all, and I didn't want to give them an incentive to kill witnesses. And if we got to the sentence, what's the best argument against the sentence? I think the best argument against the sentence is that, well, I guess I would say two. First, as you pointed out, this is a fraud case. It is not a murder case. Yeah, the guidelines. But beyond that, beyond that, well, there's two, then, I think. One, in some cases, the guidelines are simply unreasonable. They're just not linked to the ---- It's sort of hard to say the guidelines are unreasonable. But we do say that. We say that in the context of crack. Courts have said it in the context of child pornography, and I would submit that in some cases the fraud guidelines are also unreasonable. But beyond that, in this case, there was a lot of evidence, and I know that the government has a different view on this ---- I don't like saying Congress is unreasonable in some mandatory minimum. A little hard for a judge to do. Right. But if I could make my other point is that, in this case, there was substantial evidence of mental dysfunction. The defendant was never examined by a mental health professional, and frankly, I submit he should have been. He may not have been cooperative. He seemed quite incompetent enough. But his behavior was completely irrational, and his behavior at sentencing and at trial both indicated he really didn't understand the nature of the charges. In fact, he considered to assert that he was in the right and he had done nothing wrong. Did he do it again? Exactly. He did things that were so clearly harmful. Victims, 40 states, $39 million. Your Honor, I'm not saying he did a good thing. Did he say he would do the fraud again, or did he say he would do the trip to Mexico to collect on his ---- I think he said he, I'm not, you know, Your Honor, I don't know off the top of my head. I'd have to look at the sentencing again. But he did certainly imply that he, It's in the excerpt of record of 13. He'd done nothing wrong, and he felt he was in the right. And that alone suggests a mental dysfunction. Plus, there was a letter from his wife. The record reflects also that his son at one point called the prosecutor. I mean, these are not conclusive pieces of evidence, but they are strongly indicative of somebody who has some serious dysfunction. What is his argument? Let me ask you about, well, you can keep talking. Okay. No, no, you go ahead, Your Honor. I'm sorry. Is his argument that he didn't understand what the exact maximum would be, or he didn't understand that he would essentially get a life, what was a tantamount to a life sentence? Your Honor, I think the point is that the advisement taken as a whole was fundamentally misleading. And when you, I mean, I think you, I don't think you look at one specific thing and pick it out as wrong, but I think when you add the statutory part, the statutory misstatement. What's his argument, though? His argument is that he didn't understand, yes, he didn't really think he was going to get a life sentence, because especially given that his co-defendants who, granted, the court did say that they pleaded guilty early, and they were maybe not in the same situation, but their sentence was so far less than both what he faced and what he actually got. I think a reasonable defendant would think, well, yeah, maybe I'm going to get. Well, your precise argument under Feretta is he wasn't advised of and he didn't understand the penalties. That's right. Number two, the dangers, yes, but the penalties, no. Yes, he certainly understood the, I mean, the dangers. And your best cases probably are Erskine and Forrester to telegraph to the other side. You are right, Your Honor, and those are cited in my briefs. So maybe we'll ask the other side about Erskine and Forrester. And their best case is fewer, but it happens to be in the second, sir. Right. That's right. If there are no further questions, I would reserve the rest of my time for rebuttal. Thank you. Good morning, Your Honors, and may it please the Court. Eric Vandiver of the United States. Counsel. I'm even more bothered by the judge's extra advice about what the other defendants got than I am about him telling the defendant the most he could get is 90 years and giving him 100. Even 90 years would probably be enough to keep him locked up until he died. Let me address that. I don't see, just like Judge Trout, why he'd even mention that except to show him, well, you're looking at five or ten years to serve. Well, let me bring up three points I want to make on that very issue. One is defendant already knew the sentences that the co-schemers had received. I want to clarify. They were co-schemers. They were separate but related cases. They were not charged as part of the same case. But a year earlier when he was arrested after he had fled to Mexico and stayed there for three and a half years, he was brought in from Arizona. There was a detention hearing. And those same co-schemer sentences were brought up. So he already knew that information. Yeah, but that makes it worse. If he already knew it, then why did the judge bring it up? Well, I think the judge brought it up to drive home that he was going, that other people had been convicted and that the possibility of conviction was real. Well, you know, he had to know the possibility of conviction was real. But then he had this glimmer of hope that he'd end up just like them or within some range of them. Well, the second point I want to bring up is that in both instances, both at the detention hearing and at the FREDA hearing about a year apart, both the magistrate judge and the district court judge distinguished the situation between defendant and the co-schemers. At the magistrate court hearing, the detention hearing, he was told that they were cooperating defendants who had pled guilty very early. And at the district court hearing, he was told that they had pled guilty. The point of saying 50 and 71 is you're going to get a hell of a lot more if you go to trial and don't plead? Yes, Your Honor. That's what I believe the court was saying. Isn't it appropriate for the judge to say that? We're going to really mash you if you go to trial? No, not that we're going to really mash you, but I think what the judge wanted to drive home was that the consequences were very real, that he was facing life in prison. The court told him he was facing life in prison. But the broader point I want to bring up to address Your Honor's question is that no court has ever held that providing accurate information somehow undermines a waiver. Well, what about the accurate information? It's actually inaccurate. He told him the max was 90. It was in reality at the time it was 340. That's not accurate information. No, and I'll address that point. But just to address Your Honor's first question about the co-schemer sentence, no court has ever said that providing accurate information undermines a waiver. But we wouldn't, if we were to reverse, that would not be the holding. The holding would be to go back to Ballou and our cases that say you look at the whole record, and you'd have to acknowledge that that's a fact in the record. It may not be a tipping fact, but it's certainly a fact. You're not saying it can't be considered, are you? No, I'm not saying it can't be considered, but I would say that it would put in peril every district court that wants to go  well, we're going to have to acknowledge information. It's possible to make a known involvement. Counsel, there's a way to avoid misinformation, and it's an easy and obvious one. And if you look at the colloquy in this case, the judge was pursuing the right way to avoid misinformation, and that is he asked the prosecutor. It is often very complex to calculate what the maximum sentence is. The judge, it is in this case, the judge asked the prosecutor, what is the maximum sentence? And the prosecutor said X years on this, Y on that, Z on that, and it adds up to 90. That's where the judge got the 90 from the prosecutor. So all we need to avoid this kind of error is for prosecutors to be careful and do their arithmetic correctly. I agree. Why shouldn't the prosecutor take the blame for just getting this flat wrong and have to do it again? I 100% agree. The prosecutor should have corrected the judge. Agree that we should do it again. No, no, no. I agree that the prosecutor should have corrected the judge. Just to clarify, the prosecutor never ---- Well, wait. The prosecutor, you're misstating what happened. If I read the record right, maybe I read the record wrong, and if so I want you to correct my misunderstanding. My understanding was the judge did not misstate what the prosecutor told him. The prosecutor gave the judge misinformation. The judge, relying on what the prosecutor said was the max, said to the defendant, 90 is the max. The judge would have misstated. He did misstate the sentence, but he did so in reliance on the prosecutor. I think this was Judge Phillips, correct? It was Judge Phillips. Is that correct? I'll walk through exactly what happened. Is that correct is the question? That's not correct, Your Honor. What happened was the judge said, Prosecutor, will you please state the statutory maximum sentence for the charges. The prosecutor stated the statutory maximum sentence for each of the four types of charges, mail fraud, wire fraud, and two types of money laundering. The prosecutor did not add those numbers up and did not say 90. So you're saying the prosecutor gave the judge the numbers. The judge did the simple addition on those numbers and came to 90. Did the judge make an arithmetic error, and it would have been 340 if he'd done the arithmetic right on what the prosecutor told him? No. Judge Phillips added those four numbers correctly, but what she forgot to do was that there were multiple counts of mail fraud and multiple counts of wire fraud. Did the prosecutor tell her that the max could be much higher because of the multiple counts? The prosecutor failed to correct the judge. The prosecutor should have corrected the judge. I don't know why you're debating the problem that the judge relied on the prosecutor and the prosecutor let the judge down. I agree that the prosecutor should have. And he was given the wrong number, period. The prosecutor should have corrected the judge's statement about 90. And the number the defendant was given was wrong, period. The number 90 was wrong. It in a way understated the possibility, correct? Correct. The number 90 was wrong. Incidentally, if we did get past the waiver, you already know my problem with these sentences that are, they look like, well, they can't live that long. And my worry is criminals killing witnesses. And they are, after all, criminals if they're standing in federal court getting sentenced. Is there any legitimate way to say that the sentence was too much if we get that far? I don't think so, Your Honor. If you look at what the district court did, it followed the Supreme Court's and this Court's guidance to the letter. It correctly calculated the guideline range. There's no dispute as to that that was done correctly. His guideline range was life imprisonment subject to a 130-year statutory maximum. The court correctly used that range as the starting point. The court correctly recognized its discretion under Kimbrough to depart below that guideline range. And the court considered all of the 3553 factors at length. Yes, it emphasized one in particular, that is deterrence, which it's entitled to do under Treadwell. It was a discretionary sentence. Incidentally, I know the judge thought that the defendant said he would commit the crimes again. That's what the judge said in the sentencing colloquy. It wasn't clear to me in the transcript. Did the defendant testify he would commit these crimes again, or did he testify he would go to Mexico again to retrieve his investments or whatever it was? It's ambiguous, Your Honor. The judge interpreted it as he would commit the crimes again. He said, I fled to Mexico, I went to go get my money, but I would do it all over again. The judge interpreted that as, broadly speaking, he would do it all over again. But more importantly, throughout the trial, he made it very clear that he had no remorse whatsoever for his actions. Let me look at Erskine and some of the language in Erskine, if I may. In sum, we conclude that Erskine did not understand the possible punishment he faced at the time. He opted to forego counsel, and thus he did not intelligently waive. What's the evidence here that shows that Erskine did understand the possible punishment he faced? Mr. Harkless understood? Yeah. The evidence is that he was told accurately and explicitly that he faced a life sentence. The judge told him, you are facing a life sentence. And the fact that the court made a technical error and said, Is that what Judge Phillips said, you are facing a life sentence? She said, you are facing essentially a life sentence. Okay, so now we start watering it down with adjectives and adverbs. She said, you are facing essentially a life sentence. She said, you are facing 90 years. There's no difference between 90 years and three. How old was he at the time? He was 65, 64 years old at the time. So maybe even 10 years could be a life sentence. Theoretically, yes, it could be. But under any situation, 90, 340, life, he was told life. So you're hanging your hat primarily on that, the essentially a life sentence statement? No, I think even if she hadn't said that, I think there's no difference, and Gerritsen and Forrester have a materiality requirement in terms of evaluating a misadvisement of a FRERETA waiver in terms of the possible penalties. Well, this is – we're not – the problem – okay. But Forrester also says we indulge in every presumption, every reasonable presumption against waiver. That's true. That's a high hurdle that you have to cross. That is a high hurdle. But that was after the court found that there had been a material misadvisement about the statutory mandatory minimum and the statutory – Well, I don't want to beat a dead horse, but there was a material misadvisement here. 90 to 340 is pretty material. And if you're – he could have essentially faced that, but he was also looking at the fact that if it was really 90 and not 340, the other people got significantly less, and he could have interpreted that. Now, if somebody says it's 340, that kind of cooks the books. But it just seems to me that we're in a situation where even if it's a wash, the government loses because the burden is on the government, correct? Well, he was told he was facing a life sentence. I don't see – I don't see that you're representing the record quite right. It's – the way that colloquy starts is the judge says, all right, Ms. Willett, would you please state on the record the potential maximum sentence the defendant faces on these charges? Ms. Willett, yes, Your Honor. For mail fraud, 30 years. For wire fraud, 5 years. For laundering, 20 years. For a different laundering under a different section, 10 years. And then the judge says, so you're facing a potential sentence of 90 years. You understand that? Ms. Willett does not correct him. And then a few pages later, what the judge says, evidently in reference to the 90 years on a 65-year-old man, is there a reason you don't want to have another attorney appointed to represent you when you're facing what is essentially a life sentence? What the judge seems to mean by the adverb there is that 90 years on a 65-year-old man is what is as a practical matter likely to be the rest of his life because it's hard to outlive that sentence. Exactly. But it seems like the judge didn't say you're facing a life sentence. He said you're facing 90 years, adding up what the prosecutor told him. Well, the life sentence is not possible except in murder and drug cases. But I think what the court meant, and her words I think reflect it, is you are facing a life sentence. You could spend the rest of your life in prison. This is what the court said. It's what the defendant understood, too. It is what the defendant understood. The other point I want to bring home is that courts have routinely upheld FREDA waivers, even despite misadvisements in the Second Circuit, Eighth Circuit, D.C. Circuit, and even this circuit. You're talking about the Fiore case? The Fiore case in the Second Circuit. Right. So in the Second Circuit, they tell the guy he's got the possibility of 10 years, and he gets 27 months consecutive. Twenty-seven months consecutive, but he's facing 10. And then he files a challenge and said, yeah, but if you added up everything I could possibly get consecutively, and what if I got my probation revoked and I had to go back on that? Why, it could be great big. So basically we're talking about 10 years versus the 27 months. And so they said, look, this guy, he knew what he faced. The 10 was really, she was saying, or the judge was saying, you're going to get something not insignificant, and he gets 27 months. That's quite a big difference. But that sentencing happened well after. He was told 10 years. He was actually facing 125 years. In four, the defendant got less than what the judge told him was the max. Four would be a better case for you if the judge had said you face up to 10 years and had given him 20. I think the broad thing, if you take Erskine, if you take Forrester, if you take Garrison, if you take Tovar, if you take Ballot, if you take all these cases, the approach has been it's not hyper-technical. The Supreme Court has explicitly said take a pragmatic approach. It's not hyper-technical. There is no conceivable practical difference between a 90-year sentence. So what's the importance of giving accurate advice? Well, it would have been different. Just throw it to the wind? I mean, the judges say, you know, it doesn't really matter what you say because under your theory, we just kind of paste it over and say no harm, no foul. No, I'm not saying Erskine was incorrectly decided, or I'm not saying Forrester was incorrectly decided. In this case, if the judge had said 10 years, that would have been a material misstatement. He would have been misadvised, and it would have made a difference. But if we take a pragmatic approach, which is what you say the cases essentially stand for, and I think that's a fair reading of Forre and the Second Circuit. If we do take a pragmatic approach, then the judge's broad hint that you're looking at somewhere around 5 or 10 years to serve means pragmatically the defendant made a decision that would be a crazy decision  Well, again, the judge, in my view, brought that up to suggest that conviction was a real possibility and that he should not expect a sentence as lenient as those co-schemers received. The court accurately told us he was But we're not talking now about what the judge said. We're talking about what the judge internally felt but did not say. No, but what the defendant understood, he was told and understood that he was facing a life sentence, and his understanding was informed by what the judge told him. Okay, I think we have your argument in mind. Do you have another question? No, the judge should have said, listen, if you think you're going to get 51 or 70, you're out of your mind because you're the mastermind and this is a lot worse than your pals. I mean, if that's what the import of this whole thing was. I just don't think accurate information about what co-schemers received could undermine a correct statement that he was facing a life sentence. Thank you. Thank you. You have some rebuttal time. If you wish to take it. You want to snatch success from the- Sure. You want to snatch defeat from the jaws of- I'm hoping not to do so. That's why I was hesitating. You know, I do want to- I think I will just stick to one point. There was a discussion of four from the Second Circuit. The thing is here is that I think those results would be different under Forrester because Forrester itself involved advising the defendant of more. To win a four case? I mean, I thought in four the Second Circuit was pretty reasonable. The judge says you're looking at a max of ten, gives them two. Right. And the Second Circuit figures, jeez, the guy knows his way around the courtroom. No harm, no foul. You're on the air. No harm, no harm. You got a sentence nowhere near the mistaken max, let alone the real max. And my point is only that in Forrester- It seems to me that if that came to us, we might well distinguish Erskine and Forrester. Perhaps we would, perhaps. But Forrester itself involves an understatement of penalty, but still required reversal. You know, and beyond that I'm going to submit. All right. I think that's the wiser path to take here. Thank you for your time. Thank you both for your arguments this morning. The case of United States v. Harkless is submitted.
judges: Trott, Kleinfeld, McKeown